UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:23-CV-00256-GNS-CHL

TYREE KAUFMAN                                                                                        PLAINTIFF

v.

ERIC WILLIAMSON; and
ASHLEY SNELLEN                                                                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions for Summary Judgment (DN 36, 37). The motions are ripe for adjudication.

**I.      STATEMENT OF FACTS AND CLAIMS**

Plaintiff Tyree Kaufman ("Kaufman") brought this suit after he was arrested on May 23, 2022, in Nelson County, Kentucky. (Kaufman Dep. 59:3-7, 69:2-6, 101:9-13, Sept. 24, 2024, DN 37-3). The criminal charges were subsequently dismissed in Kentucky state court on November 8, 2022. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 1, at 1-2, DN 42-1 (noting the note on the case file "Drop per C.A.")). Kaufman is currently incarcerated, but previously resided in Bardstown, Kentucky where he has a son with Shaniqua McNabb ("McNabb"). (Kaufman Dep. 12:7-13:13, 19:7-21). At the time of Kaufman's arrest, McNabb lived at the Bardstown Housing Authority apartment complex ("BHA"). (Kaufman Dep. 19:7-21). Defendant Ashley Snellen ("Snellen") also lived in BHA and was acquainted with Kaufman from various brief interactions dating back to 2016. (Snellen Dep. 14:21-23, 15:18-23, Sept. 9, 2024, DN 37-2). Defendant Eric Williamson ("Williamson") is an investigator with the Bardstown Police Department ("BPD"). (Williamson Dep. 20:5-17, Oct. 23, 2024, DN 37-4).

1

From approximately August 2015 until August 2017, Kaufman would visit BHA, and he stayed with McNabb or his then-girlfriend, Aquita Claxton ("Claxton"). (Kaufman Dep. 20:2-7, 20:21-21:7, 22:10-23:3). He was arrested at the property after an interaction involving Snellen in August 2017. (Kaufman Dep. 22:10-23:3; Snellen Dep. 20:16-22:12, 23:9-12). The situation occurred when a man brought Kaufman to Snellen's home because the man observed Kaufman walking on the side of the road, and thought he "was under some kind of influence." (Kaufman Dep. 40:1-17; Snellen Dep. 20:16-21:5, 23:9-12). McNabb later arrived at Snellen's address to pick up Kaufman; both Kaufman and McNabb began arguing loudly after McNabb refused to give Kaufman a ride because he was high. (Snellen Dep. 21:2-22:12). McNabb told Snellen to call the police, and Kaufman was later arrested because of a prior warrant for unpaid child support as well as being a felon in possession of a firearm. (Kaufman Dep. 39:23-40:7, 40:15-41:8). Kaufman was incarcerated from 2017 to 2019, and he was released in September 2019. (Kaufman Dep. 174:2-5, 177:1-4). Snellen believed that Kaufman thereafter maintained a vendetta against her. (Snellen Dep. 22:7-12).

This action arises from subsequent interactions between Kaufman and Snellen, specifically in May 2022, stemming from Kaufman's prior arrest. At the time, Snellen alleged instances where Kaufman blocked her from her property by standing outside her front porch when she would arrive home, and yelling, "You owe me an apology," and "It's because of you I can't see my son." (Snellen Dep. 25:3-19). Kaufman contends McNabb falsely told Snellen that Kaufman was "going to get [Snellen]" or "something crazy about [him] doing something to her," and Kaufman reassured Snellen that he had no vendetta against her via Facebook messages shortly after he was released from jail in 2019. (Kaufman Dep. 176:3-21).

Kaufman denies that he communicated with Snellen in May 2022, yelled towards her apartment, or threatened to "get her kids." (Kaufman Dep. 42:12-17, 66:12-17, 82:4-13, 172:19-173:18). He further contends he was never on her property, and that Snellen's accusation originates from a video she claimed she had of him on her property. (Kaufman Dep. 183:5-18). Kaufman admits he "went on BHA property to visit his niece and Samantha Rummage ("Rummage"), who was his girlfriend and eventual court-ordered supervisor for visits with his son. (Kaufman Dep. 42:12-17, 66:12-17, 82:4-13). Kaufman also concedes that he visited the BHA office sometime after his May 23 arrest in order to have his son placed on Rummage's lease and was arrested for trespassing later that day. (Kaufman Dep. 59:14-17, 101:9-11).

At an unspecified earlier point, Rummage had received a notice from BHA that Kaufman was not permitted to live there for extended periods of time. (Kaufman Dep. 132:6-13). Kaufman stated he had not seen a letter directly addressed to him but saw a letter addressed to Rummage where "[his] name was spelled wrong, and [he and Rummage] didn't even know who they were talking about." (Kaufman Dep. 123:18-20, 130:17-19, 134:1-8). In May 2016, McNabb had previously been warned by BHA that having Kaufman stay with her for extended periods of time was a breach of her lease, but it remains unclear whether Kaufman was aware of these communications. (Kaufman Dep. 122:16-24).

Snellen knew Officer Williamson from his patronage of the restaurant where she had worked and Snellen gave a statement to Williamson on May 18, 2022, regarding Kaufman's alleged conduct outside her home. (Snellen Dep. 16:21-17:7; Def.'s Mot. Summ. J. Ex. B, at 1, DN 36-3 [hereinafter Snellen Statement]). Snellen told Williamson that Kaufman harassed her outside of her apartment from May 15 to 18, yelling at her and threatening to "get [her] kids" and "kill [her]". (Snellen Statement 1). Snellen also alleged Kaufman "harassed" her, and she

3

informed Williamson that she and Kaufman were "always getting into it and stuff, and he doesn't like her. He caused her problems." (Williamson Dep. 61:6-12).

Officer Williamson was already acquainted with Kaufman who had "a lot of contact with law enforcement because of domestic issues[] [and] EPO stuff." (Williamson Dep. 44:18-24). As part of his investigation for drafting Kaufman's arrest warrant, Williamson referenced footage and snapshots of video taken by Snellen and shown to him on her phone[1]; however, Williamson did not obtain or view any actual video surveillance directly from BHA. (Williamson Dep. 41:13-25; Snellen Dep. 56:11-16). Snellen showed Williamson the snapshots and footage from the BHA video on her phone, but never obtained a copy of the video itself. (Williamson Dep. 41:18-19). Williamson also acknowledged it would have been difficult to identify Kaufman from the pictures alone and that the video would have been required to identify Kaufman. (Williamson Dep. 75:8-76:5). BHA regularly provided to BPD a list of trespassers, including Kaufman, who had been "banned and trespassed from the property." (Williamson Dep. 41:20-42:4, 67:21-68:6; Def.'s Mot. Summ. J. Ex. G, at 1, DN 38-8 [hereinafter BHA Trespass List]). In addition to the list, Snellen's statement to Officer Williamson indicated that Kaufman had trespassed onto BHS property, and she identified Kaufman's black Dodge Charger on her property. (Williamson Dep. 42:24-43:3, 52:15-53:6; Snellen Statement 1).[2]

Williamson drafted the investigative report against Kaufman on May 19, 2022, for criminal trespassing in the third degree at BHS. (Williamson Dep. 54:10-17, 56:9-24). The assistant county attorney who prosecuted the trespassing case against Kaufman cited

---

[1] The referenced footage is blurry. No discernable details, such as license plates, can be gleaned from the footage, and there is no one present in the still images. (Pl.'s Resp. Def.'s Mot. Dismiss Ex. 4, at 1, DN 42-3).
[2] Snellen referenced video on her phone, which was subsequently lost when the phone fell into a swimming pool. (Snellen Dep. 56:5-10). The only surviving video is provided by Kaufman. (Pl.'s Resp. Def.'s Mot. Dismiss Ex. 4).

4

Williamson's investigative report, victim statement, Snellen's video, and the trespass list as the basis for probable cause for Kaufman's arrest. (Deaton Aff. ¶ 4, DN 36-7). The assistant county attorney also noted the warrant was signed by the state court judge on May 19, 2022. (Deaton Aff. ¶ 3). Kaufman's case was eventually dismissed by the prosecution. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 1, at 1-2 (noting the note on the case file "Drop per C.A.")).

Kaufman has asserted federal claims against Williamson (in his official and individual capacity) for false arrest/imprisonment and malicious prosecution under 42 U.S.C. § 1983 as well as claims under Kentucky law of false arrest/imprisonment and malicious prosecution against both Williamson and Snellen. (Compl. ¶¶ 37-71). Williamson and Snellen have individually moved for summary judgment on Kaufman's claims against them. (Def.'s Mot. Summ. J., DN 36; Def.'s Mot. Summ. J., DN 37).

## II.  JURISDICTION

The Court has jurisdiction over this action based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the state law claims through supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## III.  DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this lack of material fact is established, the burden then shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986). Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, "is not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968). In deciding whether to grant summary judgment, a court must view all of the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. If the record, taken as a whole, could not support a finding of fact in favor of the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Sixth Circuit has instructed courts that summary judgment is the correct stage of the litigation to evaluate a qualified immunity defense. *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) ("[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." (alteration in original) (internal quotation marks omitted) (internal citation omitted) (citation omitted)).

Qualified immunity protects "government officials from civil liability" when their actions do not violate a clearly established constitutional or statutory right that a reasonable person would have known when acting in the course of their professional duties. *See Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (citation omitted). As the Sixth Circuit has explained:

> The qualified immunity analysis is a two-step inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order. The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Id.* (internal quotation marks omitted) (internal citation omitted) (citation omitted). A defendant must first provide facts indicating his or her actions were within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). When this defense is raised, a plaintiff has the burden of showing a defendant is not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted).

As a preliminary matter, Snellen objects to Kaufman's filing containing his state court case record and the screenshots from one of Snellen's recovered videos. (Def.'s Reply Mot. Summ. J. 1-2, DN 47). "If a party fails to provide information or [to] identify a witness as required by Rule 26(a) or (e), [then] the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). In determining whether a party's late or omitted disclosure is "substantially justified" or "harmless," courts consider five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 747-48 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)). These *Howe* factors weigh in favor of the consideration of this evidence. As to the first three factors, there is no surprise here, no necessary effort needed to cure such a surprise, nor significant disruption because both Snellen and Williamson had prior notice or at least expected this evidence. The screenshot of the video is from surveillance footage that Snellen provided to Williamson and later lost, and Kaufman's dismissal of his state court case was a matter of public record and mentioned in his Complaint. (Compl. ¶ 20; Williamson Dep. 41:13-25; Pl.'s Resp. Def.'s Mot. Summ J. Ex. 4,

7

at 1). For the fourth factor, the evidence is important because it provides context for the missing video, and Kaufman provides it as support for one of the elements of his claims that his prosecution terminated without a conviction. (Compl. ¶ 20). As to the last factor, Kaufman has not provided an explanation for his failure to previously introduce the evidence, but this is merely procedural since he provided the exhibits in his response, as opposed to a sur-reply which is "highly disfavored." *See Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-CV-00048-GNS, 2019 WL 3536038, at *14 (W.D. Ky. Aug. 2, 2019) (internal quotation marks omitted) (quoting *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012)). Accordingly, the Court will consider Kaufman's exhibits filed with his response in its analysis.

      A.     **Official Capacity Claim**

Kaufman has brought at least one claim against Williamson in his official capacity. (Compl. ¶ 5). Apart from the Complaint, Kaufman never references any further official capacity arguments nor responds to Williamson's motion seeking summary judgment of this claim. (*See* Compl. ¶ 5). Because Kaufman does not address these arguments, he abandons any official capacity claim against Williamson and summary judgment is granted. *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759-60 (E.D. Ky. 2019) (explaining that when a plaintiff fails to respond to arguments in a summary judgment motion, a plaintiff concedes any issue not addressed).

      B.     **False Imprisonment Claim under Section 1983 against Williamson**

The qualified immunity analysis begins by identifying which constitutional rights are claimed to have been violated. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted). Because the elements of false imprisonment and false arrest overlap, the Supreme Court has referred to them "together as false imprisonment." *Wallace v. Kato*, 549 U.S.

384, 389 (2007). A claimant must allege that he or she was deprived of a right, privilege, or immunity secured by the U.S. Constitution or federal law by one acting under color of state law while causing the deprivation to have an actionable claim under 42 U.S.C. § 1983. *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (citations omitted). "A claim of false arrest requires the absence of probable cause for the arrest." *DeHart v. Perkins*, No. 1:22-CV-00013-GNS, 2022 WL 4279729, at *4 (W.D. Ky. Sept. 15, 2022) (citation omitted). Probable cause for the issue of a search warrant exists when there is "a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) (internal quotation marks omitted) (citation omitted). "A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (citations omitted). "[A]n arrest based on a facially valid warrant approved by a [judge] [will] provide[] a complete defense . . . ." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citation omitted). "[A] search warrant 'provides the detached scrutiny of a neutral [judge], which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime . . . .'" *United States v. Leon*, 468 U.S. 897, 913-14 (1984) (citations omitted).

The Sixth Circuit has recognized generally that a police officer may rely on a witness's information in the course of an investigation:

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. This comports with the

>general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

*Ahlers*, 188 F.3d at 370 (internal quotation marks omitted) (internal citation omitted) (citations omitted). "[A] *single* witness is sufficient to establish probable cause." *Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014). "Once a law enforcement officer has 'probable cause[,]' he is under no duty to continue the investigation to determine whether exculpatory evidence existed, and is under no obligation to investigate, or give credence to, a suspect's story or alibi." *Molnar v. Care House*, 574 F. Supp. 2d 772, 793 (E.D. Mich. 2008) (citing *Ahlers*, 188 F.3d at 371). A prosecutor's decision to seek a warrant and a judge's issuance of a warrant can ratify a prior, flawed investigation. *See Ahlers*, 188 F.3d at 373.

The Sixth Circuit's decision in *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), explains a plaintiff's burden when bringing a Section 1983 claim for false arrest. *See id*. at 305. As the court held in *Sykes*, in order to prevail on a false-arrest claim, the plaintiff is required to "prove by a preponderance of the evidence that in order to procure the warrant, [the] [officer] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Id*. (third and fourth alterations in original) (citations omitted). "If the affidavit contains false statements or material omissions, [the court then] set[s] aside the statements and include[s] the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Id*. (citations omitted). "A plaintiff shows substantial evidence of deliberate falsehood or reckless disregard when, for example, he presents proof that at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions." *Butler v. City of Detroit*, 936 F.3d

10

410, 419 (6th Cir. 2019). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (citation omitted). A court will assess the "facts and circumstances" that the arresting officer utilized at the moment of the arrest to determine if they were "sufficient to warrant a prudent person . . . in believing . . . that" the seized individual 'ha[d] committed . . . an offense.'" *Sykes*, 625 F.3d at 305 (citations omitted).

Williamson primarily argues that Kaufman's claim must fail because there was probable cause. (Def.'s Mem. Supp. Mot. Summ. J. 15-16, DN 36-1 [hereinafter Williamson's Mem. Supp. Mot. Summ. J.]). Williamson also argues that the identification of Kaufman from Snellen's screenshots, the no-trespass list, and the judge signing the warrant supported and confirmed his finding of probable cause. (Williamson's Mem. Supp. Mot. Summ. J. 15-16, 21-22; Williamson Dep. 41:13-25, 42:24-43:3, 45:20-46:5). Kaufman contests the validity of the evidence of Williamson's investigation and questions whether his findings in the investigative report are supported by probable cause, emphasizing that Snellen's video has been lost except for the surviving video he has submitted. (Pl.'s Resp. Def.'s Mot. Summ. J. 8-12, DN 42).

Kaufman has not met his burden to show that Williamson knowingly or recklessly made false statements to effect the warrant for his arrest. Kaufman argues that a "reasonably well-trained officer would have known he or she should not have applied for the warrant[,]" but this is the incorrect standard. (Pl.'s Resp. Def.'s Mot. Summ. J. 14-15). The criminal trespassing warrant was signed by a judge, creating the presumption that probable cause existed. (Deaton Aff. ¶ 3); *Sykes*, 625 F.3d at 305. Williamson admits that he would not be able to identify Kaufman without the video, but at the time of his investigation into Snellen's statement and allegations, he did have access and viewed the video to write the investigative report.

11

(Williamson Dep. 75:8-76:5). It is also true that the surviving video from the state criminal case does not depict anyone or any key details. (Pl.'s Resp. Def.'s Mot. Summ. J. 9). This brief video does not encapsulate the longer and more comprehensive video that Williamson explained he relied upon but was subsequently lost by Snellen. (Snellen Dep. 56:5-10). Kaufman incorrectly conflates Williamson's familiarity with Kaufman with the basis of his investigation and the warrant drafted when Williamson utilized other plausible evidence. (*See* Williamson Dep. 44:18-24; BHA Trespass List 1; Snellen Statement 1). Snellen's statement and video were sufficient alone to establish probable cause. *See Legenzoff*, 564 F. App'x at 142. Nowhere in the record nor in the briefing does Kaufman properly raise a question of material fact indicating that Williamson knowingly or recklessly made a false statement; only that Williamson relied upon potentially flawed information, which is not the standard required. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. 14-19). Accordingly, summary judgment must be granted as to this claim for false arrest under Section 1983.

### C. Malicious Prosecution Claim under Section 1983 against Williamson

Kaufman also asserts a Section 1983 claim against Williamson for malicious prosecution. For a malicious prosecution claim under Section 1983, a plaintiff must plead that: (1) there was a criminal prosecution initiated against him; (2) the defendant was involved in the decision to prosecute; (3) there was a lack of probable cause for the prosecution; (4) there was a resulting deprivation of liberty; and (5) the proceeding was terminated in the plaintiff's favor. *Sykes*, 625 F.3d at 308-09. The Supreme Court's decision in *Thompson v. Clark*, 596 U.S. 36 (2022) is a guide to analyzing such a claim. *Thompson v. Clark*, 596 U.S. 36, 39-40 (2022). In *Thompson*, the charges against the plaintiff in the underlying case were dismissed in an order without explanation. *Id*. at 40. The Supreme Court held as a result that "[t]o demonstrate a favorable

termination of a criminal prosecution for purposes of the Fourth Amendment claim under [Section] 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Id*. at 39.

"[A] malicious-prosecution claim[] . . . [will] stand or fall with the probable-cause determination of [the] false-arrest . . . claims." *Jerome v. Crum*, 695 F. App'x 935, 942 (6th Cir. 2017) (citation omitted). For the reasons stated above, Kaufman cannot show the lack of probable cause required for a malicious-prosecution claim. Accordingly, the Court will grant summary judgment as to Kaufman's malicious prosecution claims under Section 1983 against Williamson.

### D. Remaining Claims under Kentucky Law

All federal claims having been dismissed, and the only remaining claims are Kaufman's claims of false arrest and malicious prosecution against Williamson and Snellen arising under Kentucky law. (Compl. ¶¶ 53-71).

As to the false arrest claim, Williamson argues that he acted with probable cause, but Kaufman denies probable cause existed. (Def.'s Mem. Supp. Mot. Summ. J. 22; Pl.'s Resp. Def.'s Mot. Summ. J. 20-21). "When, as here, a law enforcement officer is the alleged tortfeasor, Kentucky collapses claims of false arrest and false imprisonment." *Estep v. Combs*, 366 F. Supp. 3d 863, 883 (E.D. Ky. 2018) (citation omitted).

> A law enforcement officer is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual. Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has "probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it."

*Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (internal citation omitted) (citation omitted).

Further, "realizing that every confinement of a person is an imprisonment, whether it occurs in a prison or a house, [courts] shall refer to the torts of false imprisonment and false arrest together as false imprisonment." *Id*. Under Kentucky law, a law enforcement officer may detain an individual pursuant to a warrant or if he has "probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it." *Id.* (citation omitted). "In the case of false imprisonment, however, the common law, or the statutory law in some states, provides a remedy for a plaintiff's unlawful detention—that is, detention without legal process." *Id*. (citation omitted)

Kentucky has adopted an analogous standard for determining whether an officer can obtain probable cause, ultimately culminating in a warrant. "[P]robable cause is a practical, commonsense decision that given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Minks v. Commonwealth*, 427 S.W.3d 802, 810 (Ky. 2014) (alteration in original) (internal quotation marks omitted) (citation omitted). As the Kentucky Court of Appeals has stated:

> [W]here evidence is sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause, it cannot be said that police officers who provide a truthful affidavit to a neutral magistrate who then issues a warrant are not objectively reasonable in believing that they have probable cause.

*Williams v. Commonwealth*, No. 2024-CA-0012-MR, 2025 WL 1005893, at *6 (Ky. App. Apr. 4, 2025) (citing *Beckham v. Commonwealth*, 284 S.W.3d 547, 551 (Ky. App. 2009)). "Probable cause does not require certainty that a crime was committed or that evidence will be present in a place to be searched." *Couch v. Commonwealth*, 686 S.W.3d 172, 178 (Ky. 2024) (citing *Moore v. Commonwealth*, 159 S.W.3d 325, 329 (Ky. 2005)). The Kentucky Supreme Court has also

advised to "give great deference to the warrant-issuing judge's findings . . . unless arbitrarily exercised." *Moore*, 159 S.W.3d at 329.

Williamson acted in accordance with the facts alleged in Snellen's statement and the trespassers list from BHA. (Williamson Dep. 42:24-43:3, 52:15-53:6, 75:8-76:5; Snellen Statement 1; BHA Trespass List 1). Based on this evidence, Williamson reasonably believed that Kaufman was engaging in criminal activity and drafted his investigative report based on his reasonable understanding of the situation. (Williamson Dep. 54:10-17, 56:9-24). Williamson's investigation led to the warrant was later signed by a Kentucky state court judge. (Deaton Aff. ¶ 3). For these reasons and those discussed for Kaufman's federal claims, Williamson acted with probable cause, and the motion for summary judgment must accordingly be granted as to the wrongful arrest claim under Kentucky law.

Williamson also moves for summary judgment on Kaufman's state-law malicious prosecution claim against him. (Def.'s Mot. Summ. J. 20-21). He chiefly argues that Kaufman's claim must fail because he acted with probable cause, and the maliciousness element cannot be proven. (Def.'s Mot. Summ. J. 22-23). In Kentucky, a plaintiff must prove the following elements of a malicious prosecution claim:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
> 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and
> 5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016). "A plaintiff must make a clear showing that the defendant acted without probable cause." *Ricchuite v. Johnson*, No. 1:14-CV-104-GNS-

15

HBB, 2017 WL 938328, at *7 (W.D. Ky. Mar. 9, 2017) (citing *Reid v. True*, 302 S.W.2d 846, 847-48 (Ky. 1957)). Malice "is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose[,]" and "may be inferred from lack of probable cause . . . ." *Stearns Coal Co. v. Johnson*, 37 S.W.2d 38, 40-41 (Ky. 1931) (citations omitted); *Seiler Waterman, LLC v. RLB Props., Ltd.*, 610 S.W.3d 188, 199 (Ky. 2020). "As 'the tort of malicious prosecution is one that has not been favored in the law,' a plaintiff 'must strictly comply with the elements of the tort.'" *Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *15 (W.D. Ky. Feb. 7, 2018) (citations omitted).

Kaufman cannot sustain his malicious prosecution claim at the summary judgment phase, particularly in light of the presumption against sustaining a such a claim. *See id*. As previously discussed, Kaufman fails to make a "clear showing" that Williamson acted without probable cause. *Ricchuite*, 2017 WL 938328, at *7 (citing *Reid*, 302 S.W.2d at 847-48). Kaufman also cannot show that there is a pending question of material fact of whether Kaufman acted with maliciousness. Kaufman's argument that malice can be inferred from the lack of probable cause is foreclosed because this Court found Williamson acted with probable cause. (Pl.'s Resp. Def.'s Mot. Summ. J. 23-25). Kaufman has not raised any evidence that Williamson knew Snellen was lying or the video he viewed, in the course of his investigation, was fraudulent. Kaufman only incorrectly classifies Williamson's reliance on the video. (Pl.'s Resp. Def.'s Mot. Summ. J. 21-23). Williamson only acknowledges that he would have difficulty identifying Kaufman without the now-missing video, but he does not raise any concerns of his impression of the video's validity or suggests it was suspect when he initially saw it. (Williamson Dep. 41:13-25; 75:8-76:5). Accordingly, Williamson's motion for summary judgment is granted as to this claim.

The only remaining claims are the state law claims against Snellen. Generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (citation omitted). The Supreme Court has permitted federal courts to exercise jurisdiction over state law claims when there existed a "common nucleus of operative fact" compromising "but one constitutional 'case,'" as long as the district court had original jurisdiction over at least one claim. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367. The holding of *United Mine Workers* additionally recognized the discretion courts have in hearing such claims: "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over the state claims . . . ." *Id*. at 726 (citation omitted). Pendent jurisdiction may be denied: (1) "if the federal claims are dismissed before trial[;]" (2) if "it appears that the state issues substantially predominate[;]" or (3) if "the likelihood of jury confusion" would be strong without separation of the claims. *Id*. at 726-27. The Sixth Circuit has advised "[c]omity to state courts is considered a substantial interest," and there is "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed—retaining residual jurisdiction 'only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues.'" *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011) (citation omitted).

The Court declines to exercise jurisdiction over Kaufman's remaining state law claims against Snellen, which may be adjudicated in a more appropriate judicial forum. (Def.'s Mem. Supp. Mot. Summ. J. 1-2, DN 37-1). Snellen's motion for summary judgment is denied.

### IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (DN 36) is **GRANTED**. All claims against Williamson are **DISMISSED WITH PREJUDICE**.

2. Defendant's Motion for Summary Judgment (DN 37) is **DENIED**. Because no federal claims remain in this matter, the Court declines to exercise jurisdiction over the state law claims against Snellen pursuant to 28 U.S.C. § 1367(c)(3), and those state law claims are **DISMISSED WITHOUT PREJUDICE**.

3. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

August 20, 2025

cc:   counsel of record